1   **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9   United States of America ex rel. Stephen)      No. CV-10-8003-PCT-FJM
    Huey,                                        )
10                                               )    **ORDER**
                    Plaintiff,                   )
11                                               )
    vs.                                          )
12                                               )
                                                 )
13  Summit  Healthcare  Association,  Inc.,  et)
    al.,                                         )
14                                               )
                    Defendants.                  )
15                                               )
                                                 )
16  ─────────────────────────────────────────)

17

18          The court has before it defendants Brim Healthcare, Inc.'s, Kevin and "Jane Doe"

19  Hawk's, and Summit Healthcare Association, Inc.'s motions to dismiss (docs. 28, 29, & 37),

20  plaintiff and qui tam relator Stephen Huey's responses (docs. 33, 34, & 45), and defendants'

21  replies (docs. 39, 40, & 47).  We also have before us the United States' statement of interest

22  (doc. 55) and Summit's response (doc. 58).

23                              **I. Background**

24          Plaintiff is a former employee of Summit, which owns and operates a hospital in Show

25  Low, Arizona.  He was Summit's Chief Financial Officer and Vice President of Finance from

26  April 2008 until his termination in November 2009.  Brim is a national company that

27  provides management services to hospitals, including Summit.  Kevin Hawk is a healthcare

28  executive employed by Brim.  He was Summit's Chief Executive Officer and President from

1  January 2009 until March 2010.[1]

2      According to plaintiff, Summit submitted false claims for reimbursement to federal

3  healthcare programs, primarily Medicare.  He alleges that Summit and Hawk, acting as a

4  Brim employee, ignored reports of patient admission issues and improperly agreed to retain

5  government payments.  Plaintiff also maintains that Summit terminated him because he was

6  investigating its claims practices.

7      In October 2007, Summit allegedly received a report from Brim advising that its

8  patients were being placed in observation when they did not meet the criteria for medically

9  necessary treatment.  The report allegedly noted that Summit was also billing Medicare for

10  inpatient services when patients did not meet Medicare criteria for inpatient admission.  This

11  report apparently used data from Summit's Program for Evaluating Payment Patterns

12  Electronic Report ("PEPPER"), a government report that shows how a hospital's Medicare

13  claims differ from similar hospitals.

14      In August 2008, Brim conducted an audit for Summit and prepared another report in

15  anticipation of a government cost recovery audit.  The report allegedly concluded that 46%

16  of Summit's observation patients were converted to inpatient status prior to discharge

17  without meeting the criteria for admission.  Based on PEPPER data, Brim also identified

18  Summit as an outlier with respect to the number of claims for "one-day stays," which are

19  inpatient admissions with a duration of less than one day.  Brim allegedly reviewed thirty-

20  four charts for one-day stay patients using proprietary guidelines that are designed to screen

21  Medicare claims.  Brim concluded that twenty of the thirty-four patients did not meet the

22  criteria for inpatient admission.  Brim apparently advised Summit that it had $744,000.00 in

23  potential liability to the government due to one-day stay claims.  The report also allegedly

24

25      [1] Plaintiff has also named "Jane Doe" Hawk as Hawk's unknown wife in an effort to

26  reach any community property he may own.  See A.R.S. § 25-215(D) (requiring spouses to

27  be sued jointly in an action on an obligation arising from acts intended to benefit the
community).

28
- 2 -

1  noted that many of Summit's patients were otherwise being admitted without meeting the
2  criteria for inpatient admission.

3  In February 2009, Summit retained an outside consulting firm, AR Systems, Inc., to
4  conduct an audit.  Plaintiff says that the audit report identified many of the same issues as
5  Brim's reports.  Moreover, plaintiff alleges that he directed Summit's Utilization Review
6  Coordinator, Marion Howe, to audit ten inpatient files per month for admissions between
7  January and June 2009.  Howe apparently used the same proprietary screening guidelines as
8  Brim.  Plaintiff asserts that 40-50% of the files reviewed did not meet Medicare admission
9  criteria.  According to plaintiff, he discussed these results with Summit's Compliance
10 Officer, Ken Allen, who said that the problem had been ongoing for years.

11 Plaintiff also alleges that Summit was misusing its internal Evaluation and
12 Management codes for emergency room services and billing for levels of service that were
13 not provided.  He says that this issue had been identified by two outside consulting firms.
14 In October 2009, Allen allegedly admitted that he had known about the issue for a couple of
15 years.  During the same month, plaintiff says that he discussed the issue with Hawk and
16 Summit's Director of Medical Records.  In addition, plaintiff claims that emergency room
17 physicians were failing to use a certain Medicare coding modifier that allows separate billing
18 for otherwise related services.

19 In support of the above allegations, plaintiff offers four exhibits attached to the First
20 Amended Complaint.  The first is entitled "Inappropriate Patient Observation" and lists
21 twenty-one patient account numbers with corresponding procedures and dates with a month
22 and a year. The second is entitled "Inpatient Admission Status" and lists twenty-three patient
23 account numbers with procedures and dates with a month and a year.  It purports to list one-
24 day stay Medicare patients who did not meet inpatient admission criteria based on screening
25 guidelines.  The third is entitled "Medicare Admission."  It lists 105 account numbers for
26 patients who purportedly did not meet inpatient admission criteria.  Many of the patients are
27 identified as one-day stay patients.  It includes a month and a year for about half of the

28

1  patients, and a year for another third.  The fourth exhibit is entitled "Emergency Room

2  Upcoding" and lists ten patient account numbers along with the difference between hours that

3  were billed and hours that were documented.  It includes a month and a year for each.

4       During a Summit board of directors meeting in July 2009, plaintiff allegedly reported

5  that Summit had significant compliance issues and discussed the above audits at length.  He

6  says that he recommended that Summit quantify its exposure, self-report, and return any

7  overpayments to the government.   Hawk allegedly told the board that it was "the

8  government's problem," and that Summit should not self-report but instead wait to see if

9  Medicare "caught" the issues.  First Amended Complaint ¶¶ 79, 12.  The Chairman of the

10  Board, Neal Thompson, allegedly agreed with Hawk that Summit should not self-report.  The

11  board apparently approved $2.4 million in reserves in anticipation of the government cost

12  recovery audit.

13       During a Summit board meeting in September 2009, plaintiff allegedly raised the issue

14  of Summit's potential legal liability if it did not self-report.  The Chairman of the Finance

15  Committee, Paul Watson, allegedly asked plaintiff to explain Summit's risk.  According to

16  plaintiff, he attempted to explain Summit's potential liability under the False Claims Act

17  ("FCA"), 31 U.S.C. § 3729, which proscribes efforts to defraud the United States.  Hawk

18  allegedly interrupted plaintiff, and Thompson allegedly stated that the board members were

19  "lay persons" who could claim ignorance of the law.  First Amended Complaint ¶ 82.

20  Plaintiff asserts that Summit did not alter its policies and procedures regarding admissions

21  from October 2007 through his termination in November 2009.

22       Separately, plaintiff alleges that the Heart Center of Northeastern Arizona ("HCNA")

23  violated a services agreement with Summit by billing it for outpatient services and over-

24  billing for certain procedures.  Summit apparently did not seek reimbursement under the

25  services agreement.  On information and belief, plaintiff asserts that Summit was receiving

26  federal funds for referrals made by HCNA.  Plaintiff also alleges that Summit failed to

27  comply with Medicare Conditions of Participation with respect to the supervision of nurse

28

1    anesthetists by physicians.

2         During October and November 2009, plaintiff allegedly made written reports of

3    compliance violations using Summit's internal reporting procedures.  In November 2009,

4    plaintiff says that he had a disagreement with Hawk about the disclosure of an alleged

5    conflict of interest on an Internal Revenue Service ("IRS") form.  Plaintiff allegedly refused

6    to sign the form unless it disclosed that Thompson was profiting from his service on the

7    board by performing realty services for all incoming executives and physicians.  Summit

8    terminated plaintiff about a week later.[2]

9                                    **II. Claim Structure**

10        Plaintiff contends that Summit, Hawk, and Brim violated the FCA, which permits a

11   person to bring a qui tam action on behalf of the United States.  31 U.S.C. § 3730(b).  The

12   United States declined to intervene.  As amended, the FCA extends civil liability to any

13   person who "knowingly presents, or causes to be presented, a false or fraudulent claim for

14   payment or approval," § 3729(a)(1)(A) ("Subparagraph (A)"), or "knowingly makes, uses,

15   or causes to be made or used, a false record or statement material to a false or fraudulent

16   claim."  § 3729(a)(1)(B).[3]  It also extends liability to a person who "knowingly and

17   improperly avoids or decreases an obligation to pay or transmit money or property to the

18   Government," § 3729(a)(1)(G), or "conspires to commit a violation of subparagraph (A), (B),

19   . . . or (G)."  § 3729(a)(1)(C).

20        Under the FCA, the term "claim" includes requests for money "presented to an officer,

21   employee, or agent of the United States."  § 3729(b)(2)(A)(i).  "[T]he term 'obligation'

22

23         [2] In his response to Summit's motion to dismiss, plaintiff offers a number of additional
     allegations and several additional exhibits.  For purposes of deciding the present motions, we
24   rely solely on the allegations and exhibits from the First Amended Complaint.

25         [3] The FCA was amended and reorganized by the Fraud and Enforcement Recovery
26   Act of 2009.  Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009).  The amendments
     generally apply to conduct on or after May 20, 2009.  Id. § 4(f), 123 Stat. at 1625.  For
27   purposes of deciding the present motions, we need not discuss the former provisions.

28                                          - 5 -

1  means an established duty, whether or not fixed, arising . . . from the retention of any
2  overpayment."  § 3729(b)(3).[4]  Although the FCA is targeted at fraud, its "knowingly"
3  scienter requirement does not require "proof of specific intent to defraud." § 3729(b)(1)(B).
4  A person acts "knowingly" with respect to information if he has actual knowledge of the
5  information, or he acts in deliberate ignorance of, or in reckless disregard of, the truth or
6  falsity of the information.  § 3729(b)(1)(A).

7      Plaintiff alleges that Summit violated Subparagraphs (A) and (B) because it falsely
8  certified, either expressly or impliedly, that its claims did not fall within a Medicare
9  exclusion that bars payment for services that "are not reasonable and necessary for the
10 diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).  In part, plaintiff
11 asserts that Summit was warned repeatedly that it was admitting patients who did not meet
12 Medicare criteria and nevertheless submitted claims for its services without changing its
13 practices.  He alleges that Summit violated Subparagraph (G) because it knowingly and
14 improperly avoided an obligation arising from the retention of an overpayment.  He
15 apparently claims that Summit acted improperly because it had knowledge of an event
16 affecting its continued right to a government payment and failed to disclose it with fraudulent
17 intent, which is a federal crime. 42 U.S.C. § 1320a-7b(a)(3).

18
19
20   [4] We note that Hawk contends that the Patient Protection and Affordable Care Act of
21 2010, 42 U.S.C. § 1320a-7k(d), limits which overpayments may give rise to an "obligation"
   under the FCA when retained. For purposes of Subsection 1320a-7k(d), "overpayments" are
22 defined as Medicare funds received or retained to which a person is not entitled, after
   applicable reconciliation. Id. § 1320a-7k(d)(4)(B). Such overpayments must be reported and
23 returned by the later of sixty days after they were identified or the date any applicable cost
24 report is due. Id. § 1320a-7k(d)(2). Any overpayment retained after this deadline is defined
   as an "obligation" within the meaning of the FCA.  Id. § 1320a-7k(d)(3).  By its terms,
25 Subsection 1320a-7k(d) does not impose any limitations on the FCA.  Because plaintiff
   sufficiently alleges that Summit retained identified overpayments for a substantial period of
26 time, we need not determine the effect of Subsection 1320a-7k(d) on this action to decide the
27 present motions.  We advise the parties to brief this issue in the future, should they find it
   relevant.
28                                    - 6 -

1    Plaintiff also alleges that Summit, Hawk, and Brim violated Subparagraph (C) because

2    Summit conspired with Hawk and Brim to violate Subparagraphs (A), (B), and (G).  This

3    allegation is primarily based on Hawk's conduct during Summit board meetings.  Separately,

4    plaintiff alleges that Summit violated Subparagraph (A) because it falsely certified that it was

5    in compliance with Medicare Conditions of Participation and the Medicare anti-kickback

6    statute, 42 U.S.C. § 1320a-7b(b), which criminalizes paying for referrals under certain

7    conditions.  Plaintiff alleges that Summit failed to comply with the former due to its nurse

8    supervision practices and with the latter due to its relationship with HCNA.  In addition,

9    plaintiff alleges that Summit violated the Medicare anti-kickback statute itself, based on the

10   same conduct.  Finally, plaintiff asserts that Summit is liable under the anti-retaliation

11   provisions of the FCA, 31 U.S.C. § 3730(h), for terminating him because he was

12   investigating and reporting violations of the FCA.

13   **III. Rule 9(b), Fed. R. Civ. P.**

14   Defendants assert that plaintiff's FCA claims fail to meet the requirements of Rule

15   9(b), Fed. R. Civ. P.  Aside from retaliation claims, FCA claims sound in fraud.  Mendiondo

16   v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1103 (9th Cir. 2008).  Therefore, plaintiff must

17   state the circumstances constituting fraud "with particularity."  Rule 9(b), Fed. R. Civ. P.

18   That is, he must include "the who, what, when, where, and how" of the alleged misconduct

19   with enough specificity to enable defendants to answer the allegations without resort to a

20   blanket denial of wrongdoing.  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th

21   Cir. 2003).  This is a pleading requirement, not an evidentiary burden.  Thus, although the

22   focus of the FCA is on false claims, plaintiff need not identify representative examples of

23   false claims at the pleading stage.  Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998

24   (9th Cir. 2010).  Instead, "it is sufficient to allege particular details of a scheme to submit

25   false claims paired with reliable indicia that lead to a strong inference that claims were

26

27

28

1   actually submitted." Id. at 998-99 (quotation omitted).[5]

2       With respect to plaintiff's FCA claims involving admissions, defendants assert that

3   plaintiff has not met the Ebeid pleading standard because he has not alleged why any

4   particular services were unnecessary in light of a patient's complaint, symptom, or illness.

5   They also find fault with the sources upon which plaintiff relies.  Defendants contend that

6   Summit's PEPPER data merely identify differences among hospitals' Medicare claims,

7   which can be explained by patient differences and do not necessarily mean that Summit's

8   claims were improper.  They also contend that the proprietary screening guidelines which

9   Brim and Summit allegedly used to evaluate Summit's claims cannot serve as a substitute for

10   a physician's clinical judgment on the medical necessity of services for a particular patient.

11   Moreover, defendants argue that the four exhibits attached to the First Amended Complaint

12   add insufficient specificity because they either do not identify whether the patients were

13   Medicare beneficiaries, they do not identify whether the services were billed to Medicare,

14   they do not identify why the services were inappropriate, or they do not identify a specific

15   date or service.  With respect to plaintiff's allegations concerning a Medicare coding

16   modifier, defendants assert that failing to use it would lead to an underpayment by the

17   government, instead of an overpayment.  Finally, defendants point out that plaintiff has not

18   identified any specific claims, and they maintain that he does not offer reliable indicia of

19   actual false claims being submitted.

20       Taking plaintiff's allegations as a whole, we conclude that his FCA claims involving

21   admissions meet the pleading requirements of Ebeid and Rule 9(b), Fed. R. Civ. P.  Plaintiff

22   offers details from several internal and external investigations and reports which allegedly

23

24   ——————————

25      [5] Summit contends that the Ebeid pleading standard conflicts with the holding in
United States ex rel. Aflatooni v. Kitsap Physicians Service, 314 F.3d 995 (9th Cir. 2002),

26   which emphasized that evidence of an actual false claim is necessary to survive summary

27   judgment in an FCA action.  However, there is no conflict between an evidentiary burden at
summary judgment and a pleading standard.

28

1  identified pervasive issues with Summit's practices.  As alleged, the reports do not rely solely

2  on PEPPER data to reach their conclusions.  While the gap between screening guidelines and

3  a physician's judgment may affect the probative value of plaintiff's allegations, it does not

4  render them too vague or unreliable given the alleged confirmation of longstanding issues

5  by Summit's Compliance Officer.  Plaintiff also supports his allegations with a detailed

6  account of several Summit board meetings.  Significantly, the attached exhibits provide

7  specific information concerning patients, Medicare beneficiary status, procedures, identified

8  issues, and dates.  To be sure, some of the information is not present for each patient account

9  number, and the information could be more specific.  For example, plaintiff could identify

10 the Medicare criteria involved and explain why they were not met.  Given plaintiff's

11 otherwise detailed allegations, however, an analysis of a particular patient's diagnosis is

12 unnecessary.  We note that plaintiff does not provide a detailed account of Summit's claims

13 submission process, which would be helpful to evaluate the presence of reliable indicia of

14 claims submission under Ebeid.  However, plaintiff's multiple reliable sources, including

15 internal and external audits, and the alleged statements by Summit's Compliance Officer,

16 lead to a strong inference sufficient at the pleading stage.

17      We reach the opposite conclusion with respect to plaintiff's separate FCA claim based

18 on Summit's compliance with Medicare Conditions of Participation and the Medicare anti-

19 kickback statute, 42 U.S.C. § 1320a-7b(b).  As noted above, plaintiff alleges that Summit

20 failed to comply with the former due to its nurse supervision practices and with the latter due

21 to its relationship with HCNA.  In the Medicare context, however, conditions of

22 participation, unlike conditions of payment, are insufficiently related to the government's

23 payment decision to form the basis of an FCA claim.  Ebeid, 616 F.3d at 997-1001

24 (discussing Mikes v. Straus, 274 F.3d 687 (2d Cir. 2001)).  Moreover, plaintiff's allegations

25 concerning referrals made by HCNA, which he offers on information and belief, are

26 conclusory and unsupported by the remainder of plaintiff's allegations.  Because it does not

27 meet the requirements of Ebeid and Rule 9(b), Fed. R. Civ. P., we dismiss plaintiff's FCA

28

- 9 -

claim based on Medicare Conditions of Participation and the Medicare anti-kickback statute.

### IV. Medicare Anti-kickback Claim

Plaintiff all but concedes that his claim alleged directly under the Medicare anti-kickback statute, 42 U.S.C. § 1320a-7b(b), should be dismissed in the absence of the United States as an intervener because the statute does not grant a private right of action. We agree that the criminal statute does not grant a private right of action, Donovan v. Rothman, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000), and grant Summit's motion to dismiss plaintiff's claim under it.

### V. Conspiracy Claims

Hawk challenges plaintiff's conspiracy claims under the intracorporate conspiracy doctrine. Generally, the doctrine recognizes that corporate entities must act through their agents and employees and that this collaborative decision-making process is not conspiratorial when the agents and employees are acting within the scope of their duties. See Portman v. Cnty of Santa Clara, 995 F.2d 898, 910 (9th Cir. 1993) (collecting cases). Based on this recognition, the doctrine bars civil conspiracy claims premised on such conduct. Although the application of the intracorporate conspiracy doctrine is unsettled in the Ninth Circuit, id., plaintiff concedes that it "may very well apply to FCA cases." Response at 12.

Plaintiff contends that Hawk conspired with Summit to violate the FCA when he and Summit's Chairman of the Board agreed that Summit should not self-report government overpayments during a board meeting. Plaintiff's specific allegations involving Hawk primarily consist of a CEO listening to a CFO's report during a corporate board meeting and his subsequent advice to the board on the best course of conduct for the corporation. These allegations describe conduct that lies at the core of what is non-conspiratorial under the intracorporate conspiracy doctrine. Even under a narrow interpretation of the doctrine, it applies to "the ministerial acts of several executives needed to carry out a single discretionary decision." Stathos v. Bowden, 728 F.2d 15, 21 (1st Cir. 1984).

Plaintiff argues that the doctrine is inapplicable because Hawk was employed by

1    Brim, a separate legal entity from Summit, in addition to being Summit's agent. On the facts

2    alleged, however, the scope of Hawk's employment with Brim was to serve as Summit's

3    agent, and he was allegedly acting within the scope of his duties.  Thus, Hawk's relationship

4    with separate legal entities does not defeat the doctrine's application to this case. Cf. Am.

5    Needle, Inc. v. Nat'l Football League, __ U.S. __, __, 130 S. Ct. 2201, 2209 (2010)

6    (eschewing formalistic distinctions in favor of a functional consideration of similar issues in

7    the antitrust context).

8         Plaintiff also argues that the doctrine is inapplicable based on an exception for

9    criminal conspiracies.  In United States v. Hughes Aircraft Co., 20 F.3d 974, 979 (9th Cir.

10   1994), the court held that the intracorporate conspiracy doctrine does not apply in criminal

11   cases because doing so would prevent a corporation acting on its own behalf, by and through

12   its employees, from being found guilty of conspiracy.  Although this is not a criminal case,

13   plaintiff asserts that the exception should be extended to civil conspiracies that could

14   otherwise be prosecuted as criminal.  He relies on a case from the Eleventh Circuit extending

15   the exception to a civil conspiracy under the Civil Rights Act of 1871, 42 U.S.C. § 1985(2),

16   where the plaintiff had necessarily alleged a criminal conspiracy in violation of 18 U.S.C.

17   § 371.  McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1034 (11th Cir. 2000) ("[J]ust

18   as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy under the

19   federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same

20   criminal wrongdoing, from civil liability under 42 U.S.C. § 1985(2).").

21        Here, plaintiff does not affirmatively allege a criminal conspiracy.  He also fails to

22   argue that he has necessarily alleged one under McAndrew.  In any event, we are not

23   persuaded that an extension of the exception for criminal conspiracies to civil cases is

24   workable.   In the context of the FCA, a plaintiff could too easily circumvent the

25   intracorporate conspiracy doctrine at the pleading stage by alleging a conspiracy "to defraud

26   the United States" under 18 U.S.C. § 371.  The victim of an FCA conspiracy is the United

27   States.  It may prosecute corporations and their agents and employees for acting in unison

28

should it find criminal charges warranted.  We conclude that the intracorporate conspiracy doctrine bars plaintiff's conspiracy claims against Hawk.  In the absence of a claim against Hawk, "Jane Doe" Hawk is subject to dismissal.  Therefore, we grant Kevin and "Jane Doe" Hawk's motion to dismiss.

Next, Brim contends that it cannot be liable for conspiring to violate the FCA because, at most, it merely had knowledge that false claims were being submitted.  Plaintiff contends primarily that Brim is vicariously liable for the actions of its employee, Hawk.  However, because the intracorporate conspiracy doctrine bars plaintiff's claims against Hawk, Brim cannot be vicariously liable for his allegedly conspiratorial conduct.  Moreover, we agree with Brim that its alleged knowledge of false claims from its auditing services is insufficient to support an FCA conspiracy claim.  "Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA."  United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 714 (10th Cir. 2006).  It is plainly insufficient to show a conspiracy to violate the FCA. Therefore, we grant Brim's motion to dismiss.  Because plaintiff cannot show that Summit conspired with another, we dismiss the conspiracy claims against Summit as well.

### V. FCA Retaliation Claim

Summit contends that plaintiff's FCA retaliation claim fails because he has pled himself out of a claim.  To plead such a claim, plaintiff must show that he engaged in protected activity, Summit knew that he engaged in protected activity, and Summit discriminated against him because he engaged in protected activity.  See Mendiondo, 521 F.3d at 1103 (interpreting former version of 31 U.S.C. § 3730(h)).  The FCA protects efforts to investigate possible false claims based on a reasonable belief of fraud against the government.  See id. at 1104.  Because plaintiff alleges that his dispute with Hawk concerning an IRS form "was a factor which eventually resulted" in his termination, and the dispute was unrelated to plaintiff's FCA allegations, Summit argues that he cannot show that he was terminated because he engaged in protected activity.  First Amended Complaint ¶ 88.

1  Plaintiff allegedly advised Summit's board of directors to address Medicare compliance

2  issues, directed Summit's Utilization Review Coordinator to investigate these issues, made

3  reports through Summit's internal procedures, and warned Summit's board of directors about

4  potential FCA liability.  Summit terminated him within months.  Plaintiff's alleged dispute

5  over an IRS form may complicate his ability to prove that he was terminated because of

6  protected activity.  But his identification of the dispute as a factor in his termination does not

7  defeat his claim at the pleading stage in light of the other factors alleged.  Plaintiff has

8  sufficiently pled that he was terminated because of FCA-protected activity.  Therefore, we

9  deny Summit's motion to dismiss plaintiff's FCA retaliation claim.

10                                    **VI. Schedule**

11       Pursuant to our Amended Rule 16 Scheduling Order (doc. 57), the initial disclosure

12  and motion to amend deadlines are ten and forty days from the date of this Order.  Due to the

13  delay in deciding the present motions, the Scheduling Order is further amended as follows.

14  Paragraph 4 is amended such that the respective expert disclosure deadlines are May 6, 2011,

15  June 6, 2011, and July 6, 2011.  Paragraph 5 is amended such that final supplementation shall

16  be made no later than August 1, 2011.  Paragraph 6 is amended such that all discovery must

17  be completed by September 1, 2011.  The remaining dates in the Scheduling order, including

18  the August 5, 2011 dispositive motion deadline, are affirmed.  The parties are advised that

19  any additional amendment to the complaint and any subsequent motion practice will not be

20  considered good cause to amend the Scheduling Order further.

21       **IT IS THEREFORE ORDERED GRANTING** Brim Healthcare, Inc.'s motion to

22  dismiss (doc. 28).

23       **IT IS FURTHER ORDERED GRANTING** Kevin and "Jane Doe" Hawk's motion

24  to dismiss (doc. 29).

25       **IT IS FURTHER ORDERED GRANTING IN PART** and **DENYING IN PART**

26  Summit Healthcare Association, Inc.'s motion to dismiss (doc. 37).  It is granted on the False

27  Claims Act claim based on Medicare Conditions of Participation and the Medicare anti-

28

1  kickback statute, the Medicare anti-kickback statute claim, and the conspiracy claims.  It is

2  otherwise denied.

3       **IT IS FURTHER ORDERED** that the Rule 16 Scheduling Order (doc. 57) is

4  amended as set forth above.

5       DATED this 2nd day of March, 2011.

6

7                      _Frederick J. Martone_

8                         Frederick J. Martone
                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28